**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SCOTT E. DAHL, )<br>　　　　Plaintiff, )<br>　　　　　　v. )<br>JO ANNE B. BARNHART, )<br>Commissioner of Social Security, )<br>　　　　Defendant. ) | Civil Action No. 05-357 Erie |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN, J.

　　　Plaintiff, Scott E. Dahl, (hereinafter "Plaintiff" or "Dahl"), commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq*, and § 1381 *et seq*. Dhal filed applications for DIB and SSI on December 12, 2003, alleging disability since July 1, 2003, due to bi-polar disorder and intermittent explosive disorder (Administrative Record, hereinafter "AR", 88-91; 98; 222-225). His applications were denied, and he requested a hearing before an administrative law judge ("ALJ") (AR 65-70; 230-234). A hearing was held before an administrative law judge ("ALJ") on May 4, 2005 (AR 27-58). Following this hearing, the ALJ found that Dahl was not entitled to a period of disability, DIB or SSI under the Act (AR 18-25). His request for review by the Appeals Council was denied (AR 5-8), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will grant the Defendant's motion and deny the Plaintiff's motion.

**I. BACKGROUND**

　　　Dahl was born on October 27, 1979, and was twenty-five years old on the date of the ALJ's decision (AR 19; 88). He has a high school education and past relevant work experience as a pizza deliverer/cook (AR 19; 99; 104).

On July 16, 2003, Dahl was involuntarily committed to the Dubois Regional Medical Center after his girlfriend claimed he threatened to kill himself (AR 188). According to his girlfriend, they had been fighting and he placed a shotgun in his mouth (AR 189). She described Dahl's severe mood problems, characterized by three-day spells where he seemed happy, overly excited and talkative, followed by longer periods of depression and feelings of loneliness (AR 188). Nelia San Jose, M.D., concluded that Dahl's girlfriend was reliable, even though Dahl minimized his symptoms and denied his girlfriend's allegations (AR 188). Dahl claimed he never made any threats to harm himself, and denied suffering from depression or psychosis (AR 188). He further denied any drug use, but admitted to drinking alcohol about once a week and becoming "really drunk" once a month (AR 189). He reported a previous involuntary commitment at a another facility due to suicidal ideation, although he was evasive about the details (AR 189). It was noted on admission that Dahl had a cut on his wrist which he attributed to a dishwashing mishap, but his girlfriend reported that he had attempted to harm himself a week earlier (AR 188-189).

On mental status examination, Dr. San Jose noted that Dahl's speech was quite rapid, and it was difficult to understand him since he talked very fast without opening his mouth (AR 127). He was evasive when asked to "tell his story," and "went on and on" in a somewhat overly inclusive fashion (AR 127). He denied auditory or visual hallucinations, paranoid delusional thinking, and suicidal or homicidal ideations, although Dr. San Jose noted that he was "obviously" minimizing his symptoms (AR 127). His mood was described as good and his affect as bright (AR 127). His insight, judgment and impulse control were all poor (AR 127). He was alert, of average to above average intelligence, and was fairly cognitively intact (AR 127). Dr. San Jose found his weaknesses were a lack of insight, manipulative behavior and poor family support (AR 127).

Dr. San Jose diagnosed Dahl with intermittent explosive disorder, rule out bipolar I disorder, mixed, severe, without psychotic features; rule out alcohol abuse; antisocial personality traits, rule out disorder; status post self-inflicted laceration of the left wrist; and assigned him a

Global Assessment of Functioning ("GAF") score of 25 (AR 190).[1]  Dr. San Jose found that hospitalization was indicated due to his very explosive erratic behavior and he posed a clear risk to himself (AR 190).  Dahl was not receptive to medication, but Dr. San Jose ordered Depakote, and recommended therapy (AR 190).

During the course of his hospitalization, Dahl became more truthful and admitted that he had been diagnosed with bipolar disorder when he was younger, and had been noncompliant with his medication (AR 128).  While hospitalized, he began taking Depakote and reported an improvement in his symptoms (AR 128).  He attended group therapy and was noted to be quite social and bright, and successfully went out with his girlfriend on a day pass (AR 128).  He was discharged home with medication, and outpatient psychiatric follow-up appointments were scheduled (AR 128).  He was instructed to take all medications, keep all outpatient appointments, avoid drugs and alcohol, and maintain a well-balanced lifestyle (AR 128).  His GAF score on discharge was reported as 50 (AR 128).[2]

Dahl was seen by John Valles, M.D., a psychiatrist, on October 31, 2003 for follow-up after his discharge from the hospital in July 2003 (AR 137-139).  His chief complaint was mood swings, and he reported that he was diagnosed with bipolar disorder when he was 12 years old, which was around the time of his first psychiatric hospitalization (AR 137).  He had taken Depakote "off and on" since then (AR 137).  He reported depressive episodes which lasted for two to three weeks at a time, wherein he would isolate himself, have little motivation, decreased concentration, significant anhedonia, and feelings of hopelessness and helplessness (AR 137).  Dahl stated that when he came out of his depression, he was hyper and impulsive, and had been

---

[1]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  Scores between 21 and 30 indicates that an individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)"  *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

[2]Scores between 41 and 50 indicate "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id*.

in trouble several times for his impulsiveness (AR 137). He had engaged in numerous spending sprees, maxed out his credit cards, and been in jail for misdemeanors and burglary (AR 137). He denied having any psychotic episodes, violent ideation or panic attacks (AR 137). His most recent psychiatric admission was due to depression with suicidal ideations secondary to an argument with his girlfriend (AR 137-138). Dahl reported increased depression with terminal insomnia and decreased energy, but denied any suicidal ideations (AR 138). He claimed he was compliant with his medication regime (AR 138).

On mental status examination, Dr. Valles observed that Dahl appeared well kempt and groomed (AR 138). He was pleasant and cooperative, and his affect was appropriate (AR 138). His speech was normal, spontaneous, coherent and relevant, and his thought process was goal directed (AR 138). Dr. Valles reported his insight and judgment as fair, and his impulse control was questionable (AR 138). Dr. Valles diagnosed bipolar disorder, rated Dahl's GAF score at 55,[3] and added Lithium to his medication regime (AR 138). He recommended that Dahl continue his psychotherapy sessions with added anger management therapy and return for follow-up in four to six weeks (AR 139).

On December 3, 2003, Dr. Valles wrote a letter to Dahl's attorney and advised him that he had evaluated Dahl and was treating him for bipolar disorder (AR 140). He opined that Dahl was "unable to work at this time and will not be able to do so for at least one year and quite probably more than this." (AR 140).

On February 24, 2004, Dr. Valles wrote a follow-up letter to Dahl's attorney relative to his condition (AR 169). Dr. Valles reported that he had seen Dahl on October 31, 2003 and since that time, Dahl was seen by a registered nurse monthly (AR 169). He indicated that Dahl's moods had stabilized, and he denied having suicidal ideation, being agitated, or exhibiting aggressive behavior (AR 169). Dr. Valles opined that Dahl was still unable to engage in meaningful employment (AR 169).

Dr. Valles completed a psychiatric/psychological impairment questionnaire on the same

---

[3]A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id*.

date, and opined that Dahl was mildly limited in a number of work related areas, but was moderately limited in his abilities to make simple work-related decisions; interact appropriately with the general public; respond appropriately to changes in the work setting; and set realistic goals or make plans independently (AR 174-175).  He was markedly limited in his abilities maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without supervision; work in proximity to others without being distracted by them; complete a normal workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; and get along with co-workers or peers (AR 173-174).  Dr. Valles further opined that Dahl's condition was ongoing, he was not a malingerer, and was incapable of tolerating even "low stress" work (AR 176).  His impairments produced "good days" and "bad days," and he was likely to be absent from work more than three times per month (AR 175).  His conclusions were reportedly based upon Dahl's work history and his psychiatric evaluation in October 2003 (AR 176).

Dahl underwent a clinical psychological disability evaluation on April 8, 2004 performed by Ronald Zelazowski, Ph.D., pursuant to the request of the Commissioner (AR 141-148).  Dr. Zelazowski found Dahl generally reliable in recounting his history, but noticed some minor and one "important" discrepancy in his description of his mental health history (AR 141).  Dr. Zelazowski noted that Dahl told him that he was diagnosed with bipolar disorder when he was in the 9th or 10th grade, which was contrary to his statement to Dr. Valles that he was first diagnosed with the disorder when he was 12 years old (AR 141).  In addition, Dahl reported to Dr. Valles that he had taken Depakote off and on since he was first diagnosed, but informed Dr. Zelazowski that he had not begun taking medication until last year (AR 141-142).

Dahl reported to Dr. Zelazowski that he suffered from bipolar and explosive disorder (AR 142).  He claimed his last manic episode occurred approximately one year previously, characterized by a high energy level, a decreased need for sleep, talkative, racing thoughts, and impulsive behaviors (AR 142).  His impulsive behavior resulted in a burglary conviction for which he spent five months in jail and two years probation, and a conviction for possession of marijuana, for which he served six months probation (AR 142).  He reportedly engaged in

5

numerous violations of the law, including stealing and fighting (AR 143). He claimed he readily angered, had frequently told off his boss, and had severely beat up five men between 1998 and 2003 (AR 143). Dr. Zelazowski was of the opinion that his fighting was part of his antisocial personality disorder (AR 143).

Dahl reported a sad mood much of the time, lasting about one to two weeks, including 75% of the time during the past year (AR 142). During these periods, he reported little or no enjoyment in activities, insomnia, decreased concentration, feelings of worthlessness, and past suicidal ideations (AR 142). Dahl relayed a history of three previous psychiatric hospitalizations, all due to suicidal ideations (AR 142-143). He reported a history of alcohol abuse as well as marijuana abuse, and admitted to using alcohol the weekend before the examination, but claimed he had not used marijuana since 2002 (AR 143). His current medication regime consisted of Depakote, Eskalith, Hydroxyzine and Seroquel (AR 143).

On mental status examination, Dr. Zelazowski reported that Dahl maintained normal eye contact and exhibited no significant shifts in anxiety during the interview (AR 144). His speech was coherent, relevant, goal-directed and normal in rate, rhythm and tone without evidence of formal thought disorder (AR 144). Dahl described his mood and "normal," and Dr. Zelazowski noted it appeared euthymic (AR 144). His affect was responsive and appropriate to thought content and the situation (AR 144). He denied having suicidal ideation and delusional thinking of all types (AR 144).

Dr. Zelazowski found he was capable of abstract thinking, appeared to be of average intelligence based upon his vocabulary and fund of knowledge, and his memory processes appeared to be grossly intact (AR 145). He became somewhat oppositional and irritable when asked to subtract serial 7's but his answers were correct (AR 145). Dahl reported difficulty controlling impulses, particularly his temper, and claimed his social judgment was poor at times (AR 145). Dr. Zelazowski reported that Dahl appeared to have some understanding of the difficulty of his mood disorder and the need for medication, but had no insight into his antisocial personality disorder and its connection with his violent temper and impulsivity (AR 146).

Dr. Zelazowski diagnosed bipolar disorder, alcohol abuse, in early partial remission, cannabis abuse, in substantial full remission, and an antisocial personality disorder (AR 146). He

considered his prognosis guarded, and felt he would benefit from continuing to see a physician for medication monitoring, as well as weekly psychotherapy (AR 146). However, he noted that psychotherapy would require a significant period of time and would require significant motivation on Dahl's part to improve his behavior and thinking (AR 146).

Dr. Zelazowski concluded that Dahl was slightly limited in his ability to understand and remember short, simple instructions; was moderately limited in his ability to carry out short, simple instructions, make simple work-related judgments, respond appropriately to work pressures and changes in a usual work setting; was markedly limited in his ability to understand and remember detailed instructions, and interact appropriately with the public, supervisors and co-workers; and was extremely limited in his ability to carry out detailed instructions (AR 148). Dr. Zelazowski further concluded that Dahl was unable to manage his personal funds in a competent manner (AR 146; 149).

On May 14, 2004, Larry Smith, Ph.D., a state agency reviewing psychologist, reviewed the psychiatric evidence of record and determined that Dahl was not significantly limited in his abilities to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; and set realistic goals or make plans independent of others (AR 164-165). He further determined that Dahl was moderately limited in his abilities to remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted; complete a normal workweek without interruptions from psychologically based symptoms; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers; respond appropriately to changes in the work setting; and travel in unfamiliar places and use public transportation (AR 164-165).

Dr. Smith noted that Dahl had several hospitalizations, but his mania was managed on

medication (AR 166). He found Dahl's memory processes were intact, his frustration tolerance was low, and his ability to function socially was impaired secondary to his extreme emotional lability (AR 166). Nonetheless, he found that Dahl was able to carry out short and simple instructions, and make simple decisions (AR 166). He concluded that his limitations in the areas evaluated were significant, but were not so severe as to preclude performance of routine tasks (AR 166).

On March 21, 2005, Dahl was evaluated by John Michalowski, LCSW at the Dickinson Mental Health Center, seeking medication follow-up for his bipolar disorder (AR 212-214). Dahl appeared guarded throughout his interview and his affect was restricted (AR 212). His eye contact was adequate, his speech was of normal rate and rhythm, and his thoughts were goal directed (AR 212). He denied any attention or concentration difficulties, and Mr. Michalowski found his insight and judgment with regards to his illness was fair (AR 212). Dahl reported that he had dropped out of treatment in Dubois because he had a "falling out" with his new psychiatrist and they "could not see eye to eye" with regards to his medication (AR 212-213). He reportedly had not taken his medication for the past three months and was sleeping less, suffered from increased irritability and had become more impulsive (AR 212). He denied any suicidal ideation or engaging in dangerous behavior (AR 212). Mr. Michalowski scheduled Dahl for an initial psychiatric evaluation so his medications could be restarted (AR 213). Dahl declined therapy (AR 214).

Manish Sapra, M.D., conducted Dahl's initial psychiatric evaluation on May 4, 2005 (AR 216-218). Dahl reported that he had been off his medications for about five months and wanted to shift his psychiatric care to the Dickinson Center (AR 216). Following the discontinuance of his medications, he reportedly began experiencing mood swings, increased irritability, racing thoughts, sleep disturbances, and was easily distracted (AR 216). His appetite was low, his concentration was poor, and he was nervous in crowds (AR 216). He denied any suicidal ideation, intent or plan (AR 216). Dahl recounted his past psychiatric hospitalizations, and Dr. Sapra noted that "apparently he was maintained on Depakote and Hydroxyzine for a long time," and the Seroquel worked well with regard to his insomnia (AR 216).

On mental status examination, Dr. Sapra found Dahl was cognitively intact, his speech

8

and psychomotor activity were within normal limits, and he was calm and cooperative (AR 217). His thoughts were goal directed and reality oriented, his memory was grossly intact, his insight and judgment appeared to be fair, and he denied hallucinations or suicidal ideations (AR 217). Dahl described his mood as fair, and Dr. Sapra reported his affect was appropriate (AR 217). Dr. Sapra diagnosed bipolar disorder and assigned him a GAF score of 55 (AR 217). He noted that Dahl had been noncompliant with his medications for about five months, and declined individual psychotherapy (AR 217). He restarted his Depakote, Seroquel and Hydroxyzine, and recommended he return for follow-up in three to four weeks (218). Dahl requested that Dr. Sapra forward a letter to his attorney telling him that he had been seen at the clinic that day, what his diagnosis was and the medications that he was prescribed (AR 218).

Dahl and Morton Morris, a vocational expert, testified at the hearing held by the ALJ on May 4, 2005 (AR 27-58). Dahl testified that he lived with his girlfriend who was employed as a nurse (AR 35). He claimed he was unable to work due to mood swings (AR 36). He testified that during his "high cycles" he engaged in activity he normally would not, and during his "low" times he felt trapped (AR 36-38). His last high cycle lasted approximately two weeks and ended "a couple [of] days" before the hearing (AR 47). Prior to that, he was in a low cycle which lasted approximately a "little less than a week" (AR 47). Dahl admitted that he was not on his medication during his low cycle, and had just restarted his medication right before the hearing (AR 48). He claimed he had discontinued his medication due to an argument with his previous psychiatrist (AR 39-40). He further testified that his medication helped "a little at least" because he realized he needed it after discontinuing it (AR 38-39). Dahl stated that he was able to watch television, socialize with friends, perform some household chores, play video games for 15 to 20 minutes at a time and play with his dog (AR 42; 44-46).

The ALJ asked the expert to assume an individual of the same age, education and work experience as Dahl, who was limited to simple, routine, repetitive tasks which were not performed in a fast-paced, production environment, involving only simple work related decisions with relatively few workplace changes, and was further limited to occasional interaction with supervisors and co-workers, and no interaction with the general public (AR 50-51). The expert opined that such an individual could perform the jobs of a college mail room envelope sorter,

injection mold press operator, linen room aide, and evening shift janitorial worker (AR 51-52).

The ALJ subsequently issued a written decision which found that Dahl was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 18-25). His request for an appeal with the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 5-8). He subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Dahl met the disability insured status requirements of the Act on July 1, 2003, the date he stated he became unable to work, and continued to meet them through September 20, 2004, but not thereafter (AR 23). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id.* If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117.

The ALJ resolved Dahl's case at the fifth step. At step two, the ALJ determined that his major depressive disorder, bipolar disorder, intermittent explosive disorder and an anti-social personality disorder were severe impairments, but determined at step three that he did not meet a listing (AR 19-20). At step four, the ALJ determined that he could not return to his past work, but retained the residual functional capacity to perform work that was limited to simple, routine, repetitive tasks, not performed in a production or quota-based environment, involving only simple, work-related decisions and in general, relatively few work place changes (AR 22). He further found that he was limited to occasional interaction with supervisors and co-workers and must avoid all interaction with the general public (AR 22). At the final step, the ALJ determined that Dahl could perform the jobs cited by the vocational expert at the administrative hearing (AR 23). The ALJ additionally determined that his allegations regarding his limitations were not consistent with the clinical and objective findings or his self-reported activities of daily living (AR 24). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Dahl fundamentally argues that the ALJ's assessment of his residual functional capacity ("RFC") is contrary to the medical evidence and his testimony. It is undisputed that Dahl suffers from major depressive disorder, bipolar disorder, intermittent explosive disorder and an anti-social personality disorder, and the ALJ specifically found that the medical evidence demonstrated these impairments were severe (AR 19). However, disability is determined not by the mere presence of impairments, but rather by the functional restrictions placed on an individual by those impairments. *See Jones v. Sullivan*, 954 F.2d 125, 129 (3rd Cir. 1991). Thus the critical issue is the extent of Dahl's RFC.

"'Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3rd Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3rd Cir. 1999); *see also* 20 C.F.R. § 404.1545(a). An individual claimant's RFC is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(e)(2). In making this determination, the ALJ must consider all evidence before him. *Burnett*, 220 F.3d at 121. Social Security Ruling ("*SSR*") 96-5p provides:

> The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence.

*SSR* 96-5p (1996), 1996 WL 374183 *5.

Dahl first argues that the ALJ failed to accord proper weight to the opinion of Dr. Valles, his treating physician, and/or rejected his opinion on inadequate grounds in violation of the treating physician rule. It is well settled in this Circuit that the opinion of a treating physician is entitled to great weight and can only be rejected on the basis of contrary medical evidence. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988). However, an ALJ may reject the opinion of a treating physician if it is "conclusory and unsupported by the medical evidence."

*Jones v. Sullivan*, 954 F.2d 125, 129 (3rd Cir. 1991). When medical testimony conflicts or is inconsistent, the ALJ is required to choose between them. *Cotter v. Harris*, 642 F.2d 700, 705 (3rd Cir. 1981). In making that choice, a treating physician's conclusions are to be examined carefully and accorded more weight than a non-treating physician's opinion. *Podedworny v. Harris*, 745 F.2d 210, 217 (3rd Cir 1984). Where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reasons for doing so. *Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

Contrary to Dahl's contentions, we find that the ALJ considered Dr. Valles' opinion consistent with the above standards. As previously set forth, Dr. Valles opined in December 2003 that Dahl was unable to work for at least a year and possibly longer (AR 140). In February 2004 he opined that Dahl was still unable to engage in meaningful employment and was markedly limited in a number of work-related areas (AR 169; 174-176). The ALJ concluded that the totality of the evidence failed to support these conclusions (AR 19). He observed that although Dr. Valles opined Dahl was unable to work, he nonetheless reported in February 2004 that his mood was stabilized, and he denied suicidal ideation, agitation, and aggressive behavior (AR 20). He further recognized that notwithstanding Dr. Valles' opinion that Dahl had difficulties in maintaining social functioning, and concentration, persistence or pace, Dr. Sapra found that he was alert and oriented to time, place and person, and his cognition was intact (AR 21). Finally, the ALJ found that the medical evidence reflected an improvement in his condition when he was compliant with his medication regime (AR 22).

Upon review of the ALJ's decision and consideration of all the record evidence here, we find no error in the ALJ's decision declining to accord Dr. Valles' opinions controlling weight. We first observe that like the RFC assessment, an opinion on whether a claimant meets the statutory definition of disability (i.e., is "disabled" or "unable to work"), is not a medical opinion,

"but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case. ..." 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3rd Cir. 1994). In addition, a treating physician's opinion is not entitled to controlling weight if it is inconsistent with other substantial evidence of record. 20 C.F.R. § 404.1527(d)(2); *see also Grandillo v. Barnhart*, 105 Fed.Appx. 415, 418-19 (3rd Cir. 2004) (rejecting treating physician's opinion as inconsistent with his own clinical findings); *Allison v. Barnhart,* 100 Fed.Appx. 106, 109 (3rd Cir. 2004) (same).

Here, there is substantial evidence in the record to support the ALJ's finding that Dahl can engage in substantial gainful activity with certain restrictions. We note, for example, that Dr. Valles' opinions were inconsistent with his mental status examination findings in October 2003.[4] At this examination, Dr. Valles reported that Dahl was well groomed, pleasant and cooperative (AR 138). His affect was appropriate, his speech was normal, spontaneous, coherent and relevant, and his thought process was goal directed (AR 138). Dr. Valles assigned him a GAF score of 55, which indicates only moderate symptoms. Likewise, as noted by the ALJ, Dr. Valles' opinion was also inconsistent with his report in February 2004, wherein he reported that Dahl's moods had stabilized, and he had no suicidal ideation, agitation, or aggressive behavior (AR 169). Indeed, the record is simply devoid of any evidence demonstrating a deterioration in Dahl's condition that would preclude him from working.

In addition, Dr. Valles' opinions were contrary to Dr. Zelazowski's findings on mental status examination in April 2004. Dahl reported his mood as "normal," and Dr. Zelazowski found him euthymic (AR 144). His speech was coherent, relevant, goal-directed and normal in rate, rhythm and tone without evidence of formal thought disorder (AR 144). His affect was responsive and appropriate, and he denied suicidal ideation and delusional thinking of all types (AR 144). Dr. Zelazowski found Dahl was of average intelligence and was capable of abstract

---

[4]Although Dr. Valles rendered opinions relative to Dahl's condition in December 2003 and February 2004, the medical record reflects that Dahl was seen by Dr. Valles only in October 2003.

thinking (AR 145).

Moreover, as the ALJ noted, Dr. Valles' opinions were at odds with Dr. Sapra's recent findings in May 2005. Dr. Sapra noted that Dahl had been prescribed Depakote and Hydroxyzine for a long period of time, and began experiencing symptoms only when he discontinued his medications (AR 216). Dr. Sapra found Dahl was cognitively intact, his speech and psychomotor activity were within normal limits, and he was calm and cooperative (AR 217). Although he described his mood as only "fair," his thoughts were goal directed and reality oriented, his memory was grossly intact, and he denied hallucinations or suicidal ideations (AR 217).

Furthermore, as observed by the ALJ, Dahl's symptoms were managed with medication. When compliant with his medication regime, his mood was stabilized, and there were no signs of suicidal ideation, agitation or aggressive behavior (127-128; 169; 216). His sleep improved and he exhibited no psychotic or violent ideation (AR 137-138; 216). Dahl himself stated that when he discontinued his medication he "started realizing I had problems again" (AR 38).

Finally, Dr. Valles' opinion was at odds with Dr. Smith's opinion, the state agency reviewing psychologist, who concluded that his limitations were not so severe as to preclude the performance of routine tasks (AR 166). It is long settled that the findings of a non-examining physician may be substantial evidence defeating contrary opinions. *Jones v. Sullivan,* 954 F.2d 125, 129 (3rd Cir. 19991) (ALJ did not err in rejecting opinion of treating physician in favor of opinions from state agency physicians, where treating physicians' opinions were conclusory and unsupported by the medical evidence).

Dahl also challenges the ALJ's rejection of Dr. Zelazowski's finding that he was markedly restricted in his ability to interact appropriately with supervisors or co-workers. The ALJ rejected this finding, at least in part, on the grounds that it was inconsistent with Dr. Sapra's findings (AR 21). As previously indicated, Dr. Sapra found that Dahl's thoughts were goal directed and reality oriented, his memory was grossly intact, his insight and judgment appeared to be fair, and he denied hallucinations or suicidal ideations (AR 217). Dahl described his mood as

fair, and Dr. Sapra reported his affect was appropriate (AR 217). Dr. Sapra assigned him a GAF score of 55, again, indicating only moderate symptoms (AR 217).

The ALJ nonetheless accounted for Dahl's moderate limitations in social functioning by limiting him to work that involved limited social contact and only occasional interaction with supervisors and co-workers, and no interaction with the public (AR 21-22). Consequently, the ALJ considered Dr. Zelazowski's report with respect to Dahl's complained of difficulty with interpersonal relationships, and imposed the appropriate limitations in this area that were supported by the evidence as a whole. We therefore find no error in this regard.

Dahl next challenges the ALJ's credibility determination. An ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529(a). Subjective complaints must be seriously considered, whether or not they are fully confirmed by the objective medical evidence. *See Smith v. Califano*, 637 F.2d 968 (3rd Cir. 1981). The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson,* 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F2d 871, 873 (3rd Cir. 1983).

Here, the ALJ found that Dahl's testimony regarding his allegations of totally disabling limitations were not consistent with the medical findings or his self-reported activities of daily living (AR 24). The ALJ noted that Dhal testified to experiencing high and low cycles with his condition, but that he further testified he was compliant with his medication, which stabilized his condition (AR 22). The ALJ further noted that he lived with his girlfriend, played video games, visited friends, watched television and took care of his dog (AR 22). The ALJ observed that the medical evidence reflected improvement in his condition with the administration of medication, and that his cognition was intact, speech and psychomotor activity were within normal limits,

16

and his thoughts were goal directed and reality oriented (AR 22).  The ALJ's RFC assessment fully accommodated Dahl's subjective complaints and limitations relative to his impairments (AR 22).  Dahl claims that the ALJ's consideration of his daily activities in evaluating his credibility was in error.

We observe that the ALJ did not rely solely on his daily activities in finding that Dahl had the capacity to engage in a substantial gainful activity.  In fashioning his RFC, he also relied upon Dahl's own reported improvement with medication, and the medical evidence of record (AR 22).  His evaluation was completely consistent with the requirement that in determining a claimant's residual functional capacity, an ALJ must consider "all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of the evidence."  *SSR* 96-5p (1996), 1996 WL 374183 *5.  We find that the ALJ's credibility determination was supported by substantial evidence.

Finally, Dahl challenges the ALJ's hypothetical question posed to the vocational expert.  The law is well established that "[w]hile the ALJ may proffer a variety of assumptions to [a vocational] expert, the vocational expert's testimony concerning a claimant's ability to perform alternative employment may only be considered for purposes of determining disability if the question accurately portrays the claimant's individual physical and mental impairments."  *Podedworny v. Harris*, 745 F.2d 210, 218 (3rd Cir. 1984).  In other words, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence."  *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3rd Cir. 1987), *citing, Podedworny, supra.  See also Wallace v. Secretary of Health and Human Services*, 722 F.2d 1150 (3rd Cir. 1983).

Here, Dahl argues that the ALJ's hypothetical relative to his functional restrictions failed to include the limitations found by Dr. Valles and Dr. Zelazowski.  Because we have already

determined that no error occurred in the ALJ's evaluation of the medical evidence, it was not error for the ALJ to rely on the vocational expert's testimony.

## IV. CONCLUSION

An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SCOTT E. DAHL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 05-357 Erie |
| ) | |
| JO ANNE B. BARNHART, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER

AND NOW, this 7th day of June, 2006, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 8] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 10] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff, Scott E. Dahl. The clerk is directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.